**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| TERENCE SUTTON and ANDREW ZABAVSKY,<br><br>     *Plaintiffs*,<br><br>v.<br><br><br>UNITED STATES OF AMERICA<br>950 Pennsylvania Avenue, NW<br>Washington, DC 20530-0001<br><br>     *Defendant*. | Civil Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**INTRODUCTION**

1.      This is an action under the Federal Tort Claims Act on behalf of two brave police officers who selflessly served this city and country in D.C.'s most dangerous neighborhood.  After a tragic accident that occurred amidst the racial unrest of 2020, the officers were scapegoated and maliciously prosecuted, without factual or legal basis, so that government officials could respond to the politics of the moment.  While President Trump rightfully pardoned the officers on the third day of his second term, this suit is necessary to compensate the officers for the significant damages they incurred under the prior administration and to ensure that those involved in this malicious prosecution are held accountable.

2.      Lieutenant Andrew Zabavsky and Officer Terence Sutton were part of an elite, "crime suppression team" (CST) that was deployed to Kennedy Street, one of D.C.'s most dangerous. According to the Justice Department, Kennedy Street contained several "prolific open air drug trafficking markets" operated by a violent gang called the Kennedy Street Crew, or "KDY." In response to multiple KDY-related shootings, D.C. police established a permanent CST

1

presence on Kennedy Street.  As its name suggests, CST's mission is to stop violent crime before it starts. Given their intimate knowledge of the neighborhood, Lieutenant Andrew Zabavsky and Officer Terence Sutton were natural choices for this dangerous assignment.

3.      On October 23, 2020, Lieutenant Zabavsky, Officer Sutton, and the other officers stationed on Kennedy Street received a concerning report from an experienced patrol officer: she had stopped a fight involving Karon Hylton-Brown earlier that day, and Hylton-Brown was now back, driving around aimlessly as if "looking for someone." Hylton-Brown, validated member of KDY, was well-known to the officers: he had twenty-one prior arrests, including for gun possession, armed robbery, and drug-dealing, and was regularly associated with other known-KDY members in Kennedy Street's open-air drug markets. The patrol officer believed the altercation was indicative of KDY "infighting."

4.      Based on this tip, Officer Sutton, Lieutenant Zabavsky, and multiple other police officers went looking for Hylton-Brown so that they could conduct a *Terry* stop based on the reasonable suspicion of impending gang-related violence. When they found and attempted to stop Hylton-Brown, he fled and, in the process, drove recklessly and committed a number of traffic infractions, including cutting through an intersection against the traffic light.

5.      After fleeing police for two to three minutes at less than 30 mph, Hylton-Brown drove through an alley and into oncoming traffic and was struck by a third-party vehicle. He died from his injuries three days later.  At the time of the accident, Hylton-Brown had oxycodone, benzodiazepine, and THC in his bloodstream and $3128 taped to his thighs.

6.      Hylton-Brown's death, which occurred amidst the nationwide civil unrest and anti-police movements of 2020, caused an uproar in D.C.  Much of this uproar was based on disinformation, including a flood of false claims on social media asserting that Sutton had struck

Hylton-Brown with his vehicle.  In reality, and as Defendant's agents well knew from the moment of the accident, Sutton was over 40 feet away from Hylton-Brown when Hylton-Brown collided with a private third-party vehicle.

7. Nonetheless, politicians and political activists, in an attempt to score political points during an election cycle where race-relations and police brutality were major issues, spread misinformation about Hylton-Brown's death in order to add fuel to the fire at a particularly tense moment in our nation's history.

8. As a result, citizens took to the streets of Washington, D.C., in protest. Over the course of a week (which occurred just before the 2020 Presidential election), protesters hurled rocks and improvised explosive devices at police officers, causing devastating injuries and damage to government property.

9. Politicians and prosecutors were desperate to quell the violence and deflect responsibility. At first, government officials released body-worn camera footage of the incident to prove that Officer Sutton did not make contact with Hylton-Brown and demonstrate transparency. When that did not stop the public outcry, and as the new presidential administration came into office on the promise of being tough on police-involved deaths, members of the Department of Justice ("DOJ") and the Federal Bureau of Investigations ("FBI"), in order to curry favor with the new administration, decided to make Officer Terence Sutton and Lieutenant Zabavsky their scapegoats.

10. But the DOJ and FBI officers had a problem.  Criminal cases against police for on duty misconduct are typically prosecuted under 18 U.S.C. § 242, which prohibits police from willfully depriving citizens of their constitutional rights.  But the Supreme Court had squarely held that where, as here, officers pursue a suspect but do not make contact with him, there is no Fourth

3

Amendment seizure at all, much less an unreasonable seizure in violation of the Fourth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998). And there was no evidence whatsoever of any sort of racial profiling that could implicate the Equal Protection clause. To the contrary, it was undisputed that the officers had known Hylton-Brown for years, were familiar with his lengthy arrest record and KDY-affiliation, and were acting on a specific tip of potential gang-related violence.

11.     But DOJ and FBI didn't like this clearly established federal law, and it was certainly not convenient when they were looking to show that they were taking bold action against alleged police misconduct.  So they came up with a novel theory to charge Officer Sutton with reckless "depraved heart murder" under District of Columbia law.  Even though Sutton was driving, at most, twenty-six miles per hour at the time of the accident, the FBI and DOJ agents declared that Sutton's driving was "reckless" because it violated an internal Metropolitan Police Department of the District of Columbia ("MPD") policy against pursuing a suspect "for the purpose of affecting a stop for a traffic violation." Using this baseless allegation, Defendant got an innocent man indicted for murder.

12.     As Defendant's agents well-knew, however, their charges were flawed both factually and legally.  Factually, the DOJ and FBI officers involved knew that Sutton's pursuit of Hylton-Brown was not solely, or even primarily, "for the purpose of affecting a stop for a traffic violation," but rather due to Hylton-Brown's suspected involvement in an ongoing, gang-related altercation and his dangerously reckless flight from police.  Legally, the DOJ and FBI officers knew that the D.C. Court of Appeals had repeatedly held that police pursuits of even 80 mph did not constitute even civil gross negligence.  *See District of Columbia v. Walker*, 689 A.2d 40, 49 n.19 (D.C. 1997) ("[V]irtually all appellate opinions addressing vehicular police pursuits of

4

suspected law violators that ended in collisions between the pursued vehicles and vehicles of third parties hold as a matter of law that the police conduct … did not constitute gross negligence.") (collecting cases).  Similarly, the DOJ and FBI officers were well aware that the violation of an internal MPD policy was not sufficient for even a finding of civil negligence, let alone reckless murder. *See id.* at 47 n.13 (the violation of an internal MPD rule is insufficient to support a "finding of negligence, let alone gross negligence" (quoting *Abney v. District of Columbia*, 580 A.2d 1036, 1041 (D.C. 1990)); *District of Columbia v. Henderson*, 710 A.2d 874, 875-77 (D.C. 1998) (holding that no reasonable juror could find gross negligence where officer drove 10 mph over the speed limit, ran a redlight, and struck and killed a motorist, and that the violation of a MPD General Order 301.03 "cannot … support the kind of finding *Walker* requires for gross negligence"). Nonetheless, DOJ and FBI pursued a baseless indictment and malicious prosecution of Officer Sutton for murder.

13.    The DOJ and FBI officers also caused Sutton and Zabavsky to be charged with obstruction of justice and conspiracy to obstruct justice for allegedly seeking to prevent "information relating to the commission or possible commission of a Federal offense" from reaching federal officials and for allegedly minimizing Hylton-Brown's injuries in their initial internal reporting, in violation of 18 U.S.C. § 1503.  But this charge, too, is totally unfounded on its face because there was never any underlying actual, or even "possible commission of a Federal offense."  Rather, as the DOJ and FBI officers well knew, any "possible" federal offense was precluded *ab initio* by *County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

14.    At trial, the district court precluded Officer Sutton from raising a justification defense—that is, from arguing that he was authorized as a police officer to use reasonable means to affect a lawful stop. Instead, Officer Sutton was treated as though he were a private citizen who

chased another citizen based on a personal dispute. In particular, Sutton was only "permitted to assert the same defenses to second degree murder that would be available to any defendant charged under that statute," and "was not entitled to assert a defense available only to" law enforcement. *United States v. Sutton*, No. 21-0598, Dkt. 530, at 16. In the district court's view, "police officers like everyone else are subject to generally applicable laws unless there's an express exemption." *Id.* at 17; *see also* Dkt. 321, at 11; Dkt. 364 at 30.

15. Still, Sutton could have shown that he complied with the MPD order because the "pursuit" was not solely, or even primarily, "for the purpose of affecting a stop for a traffic violation," but rather due to Hylton-Brown's suspected involvement in an ongoing, gang-related altercation and his dangerously reckless flight from police (itself a felony under D.C. Law). But the district court excluded all evidence of Hylton-Brown's criminal history and KDY-affiliation, as well as the fact that, minutes before the pursuit, the patrol officer told Sutton, Zabavsky, and other officers that she believed the altercation she witnessed involving Hylton-Brown earlier that day—an altercation between known gang members, which occurred in a known, "open air drug market," and was audibly over money—was indicative of KDY "infighting." This allowed the prosecution, in coordination with the DOJ and FBI officers, to tell the false story that Sutton simply picked a kid off the street who was "not doing a damn thing wrong," as the prosecutor would later tell a jury, and whose only crime was "driving on the sidewalk," and "chased him to his death." Indeed, throughout this flawed investigation and malicious prosecution, Defendant's agents repeatedly hid and minimized Hylton-Brown's criminal record and gang affiliation in order to press a false narrative that Plaintiffs tried to stop Hylton-Brown, in the prosecutor's words, "for simply minding [his] own business."

16.     Similarly, even though the obstruction charges required the government to show that Lieutenant Zabavsky and Officer Sutton concealed "information relating to the commission or possible commission of a Federal offense," 18 U.S.C. § 1503, the DOJ and FBI officers never explained what federal civil rights crimes they supposedly investigated or why they believed those crimes may have occurred.  That was because the officers knew well that there was no "possible … federal offense."   Rather, the officers papered over this fundamental problem by simply testifying that there was a "federal civil rights investigation." Lieutenant Zabavsky and Officer Sutton were not able to challenge this testimony, or meaningfully cross-examine the DOJ, FBI and Metropolitan Police Department Internal Affairs Division ("IAD") witnesses about it, because, on the government's motion, the district court forbade Officers Sutton and Zabavsky from "argu[ing] that the facts of this incident do not establish a federal civil rights violation." *Id.*, Trial Tr. (12/14/22 AM) at 12:4-10, and refused to instruct the jury that "murder is not a federal crime" or explain the elements or the nature of the "possible federal crime" underlying the Government's obstruction charges. The DOJ then filled this instructional void by falsely and repeatedly telling the jury that Officers Sutton and Zabavsky were charged with obstructing the investigation of the alleged "murder."  But, as the DOJ well knew (but the jury presumably did not), murder is not a federal offense and was not the offense underlying the federal obstruction charges.

17.     After a trial at which they were precluded from putting on a meaningful defense, Officers Sutton and Zabavsky were convicted and sentenced to 66 months and 48 months in prison, respectively.

18.     Thankfully, President Trump recognized the prosecution of Officers Sutton and Zabavsky for the miscarriage of justice that it was.  Accordingly, on his third day back in office, President Trump issued Officers Sutton and Zabavsky full and unconditional pardons.

19.     At that point, Officer Sutton and Zabavsky's appeals were pending with the D.C. Circuit.  Accordingly, on January 23, 2025, the DOJ moved to vacate their convictions, which the D.C. Circuit granted.

20.     Recognizing that the prior administration "chose politics over police" in the wake of the 2020 civil unrest, Ed Martin, then Acting United States Attorney for the District of Columbia, explained that the pardons of Sutton and Zabavsky were necessary to rectify Plaintiffs' "wrongful[] convict[ions]," which were premised on "bogus charge[s]." DOJ subsequently moved the district court to dismiss the indictments against Sutton and Zabavsky, which it did on February 25, 2025.

21.     The United States therefore has admitted that there was no legal or factual basis for its prosecution of Officer Sutton and Lieutenant Zabavsky and that the prosecutions were politically-motivated.

22.     In particular, DOJ and FBI personnel knew of the lack of any probable cause for the investigation and charge before criminal process was ever initiated. Agents of the United States of America utilized their official positions and offices to initiate a baseless investigation, keep that investigation open, and undertake illegitimate investigative steps, with the object of and ultimate result of unjustified criminal charges being filed and prosecuted against Officer Sutton and Lieutenant Zabavsky for political gain.

23.     This lawsuit seeks accountability and damages against the United States for these wrongs. Specifically, Plaintiffs seek relief herein for the wrongful and malicious prosecution, false arrest, and false imprisonment experienced by Metropolitan Police Officer Terence Sutton and Metropolitan Police Lieutenant Andrew Zabavsky following the death of Karon Hylton-Brown as

a result of actions by agents of the FBI and DOJ including FBI Special Agents Luke Brunot and Jynika Craig, and DOJ Special Agents Sean Ricardi and Mark Fitzgerald.

24.    Although the Plaintiffs have been pardoned and rightfully reinstated to the police force, significant damage had already been done. They suffered extreme economic losses, incurred astronomical legal fees in order to clear their names, faced deprivations of liberty, suffered reputation harm from endless news articles which parroted the DOJ's false narrative and the characterizing Plaintiffs as murderers, and suffered emotional and psychological harm from their wrongful prosecutions.

## PARTIES

25.    Plaintiff Terence Sutton is a law enforcement officer with over ten years of law enforcement experience. At the time of the events and allegations in this Complaint, he was a MPD police officer assigned to the Crime Suppression Team in MPD's Fourth Police District. During his time on the force, Officer Sutton received over sixty commendations, including Fourth District Officer of the year in 2012.  He had never been found to have used excessive force.

26.    Plaintiff Andrew Zabavsky is a law enforcement officer with over eighteen years of law enforcement experience. At the time of the events and allegations in this Complaint, he was a Lieutenant with the MPD that supervised the Fourth Police District's CST officers. During his time on the force, Lieutenant Zabavsky received dozens of commendations, including Fifth District Sergeant of the year and Third District Officer of the year. While supervising the 4th District CST office, his unit received the CST unit of the year over the other six districts in the city.

27.    Defendant United States of America is sued under 28 U.S.C. § 1346.

### PRIMARY WRONGDOERS ON BEHALF OF THE UNITED STATES

28.    The following individuals are interconnected through their roles in the overarching investigation and malicious prosecution of Officer Sutton and Lieutenant Zabavsky, but it is not a comprehensive list, as many names of United States law enforcement agents and officials remain confidential and redacted from available documents or otherwise have not been provided to Plaintiffs.

29.    References to any actions taken by agencies of the United States, such as the Federal Bureau of Investigation or Department of Justice, encompass actions by their officers, appointees, employees, agents, and/or contractors, both known and unknown to Plaintiffs.

30.    Sean Ricardi, during the relevant period, was a Special Agent within the U.S. Attorney's Office for the District of Columbia, and the lead agent in the criminal investigation into and prosecution of Officer Sutton and Lieutenant Zabavsky. At all relevant times, throughout the investigation and prosecution of Plaintiff, Agent Ricardi was a member of the "Prosecution Team" and exercised influence of all decisions in the investigation and prosecution of Plaintiffs. Agent Ricardi was the "lead special agent" assigned to the investigation and prosecution of Officer Sutton and Lieutenant Zabavsky. He investigated the incident, gathered evidence to be used in the criminal trial, and interviewed witnesses. Agent Ricardi was also instrumental in causing the Government to indict Plaintiffs without probable cause.  Agent Ricardi testified before the grand jury in order to seek an indictment without probable cause. He also testified against Officer Sutton and Lieutenant Zabavsky in their criminal trials, misleading the jury and ensuring the prosecution would secure a conviction. Agent Ricardi was closely involved in the decision to charge Officer Sutton and Lieutenant Zabavsky under the novel and improper theories described above and actively campaigned for those charges despite knowing that the charges were not supported by

10

probable cause. Agent Ricardi remained involved throughout the trial of Sutton and Zabavsky, attended court hearings, sat at counsel's table with the prosecutors during the trial, conferred with the prosecutors during recesses, help prosecutors prepare misleading jury presentations and witness examinations, made decisions about what evidence to turn over to the defense, used and threatened to use IAD to intimidate and retaliate against police who might testify favorably to the defense, and participated in all decisions, including the prosecutors' decisions to repeatedly present false and misleading testimony and argument.

31.    Mark Fitzgerald, during the relevant period, was a Special Agent within the U.S. Attorney's Office for the District of Columbia who was a key participant in the criminal investigation into and prosecution of Officer Sutton and Lieutenant Zabavsky and a member of the Prosecution Team. Along with Agent Ricardi, he conducted an investigation of the incident, gathered evidence to be used in the criminal trial, interviewed witnesses, and facilitated the malicious prosecution of Plaintiffs. At all relevant times, throughout the investigation and prosecution of Plaintiff, Agent Fitzgerald was a member of the "Prosecution Team" and exercised influence of all decisions in the investigation and prosecution of Plaintiffs.

32.    Jynika Craig, during the relevant period, was an FBI Special Agent who was a key participant in the criminal investigation into and prosecution of Officer Sutton and Lieutenant Zabavsky. She interviewed witnesses, assisted with investigative memoranda, and facilitated the malicious prosecution of Plaintiffs. At all relevant times, throughout the investigation and prosecution of Plaintiff, Agent Craig was a member of the "Prosecution Team" and exercised influence of all decisions in the investigation and prosecution of Plaintiffs.

33.    Luke Brunot, during the relevant period, was an FBI Special Agent who was a key participant in the criminal investigation into and prosecution of Officer Sutton and Lieutenant

11

Zabavsky. He interviewed witnesses and facilitated the malicious prosecution of Plaintiffs. At all relevant times, throughout the investigation and prosecution of Plaintiff, Agent Brunot was a member of the "Prosecution Team" and exercised influence of all decisions in the investigation and prosecution of Plaintiffs.

34. Joseph Della-Camera, during the relevant period, was an agent of the Metropolitan Police Department of the District of Columbia within the Internal Affairs Division—a role he held since July 2019. On the night of Hylton-Brown's flight, Agent Della-Camera was assigned to lead an internal investigation of the incident. After only conducting a cursory investigation which revealed no wrongdoing, Agent Della-Camera referred the matter for criminal prosecution for civil rights violation and thereafter worked at the direction of DOJ and FBI officers to secure a criminal conviction. Throughout the investigation and prosecution of Plaintiffs, Agent Della-Camera took steps, at the direction of the FBI and DOJ agents named above, to help DOJ intimidate MPD officers from testifying in a manner that did not fit the Government's narrative. Specifically, at the direction of DOJ, he used IAD's disciplinary authority to intimidate the MPD officers set to testify at trial. As stated in more detail below, when MPD officer Cory Novick resisted these intimidation tactics and testified truthfully at trial, Agent Della-Camera and others took steps to ensure that Officer Novick could never obtain another job in law enforcement.

## JURISDICTION AND VENUE

35. This Court has original subject matter jurisdiction over all claims under 28 U.S.C. §§ 1331 and 1346(b)(1) because they arise under federal law and because the United States is a defendant.

36. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2) and 1402(b) because the events that give rise to Plaintiffs' claims occurred within this District.

12

**STATEMENT OF FACTS**

I.     **Officer Sutton and Lieutenant Zabavsky Were Stationed in Washington D.C.'s Most Dangerous Neighborhood.**

37.     On October 23, 2020, Officer Sutton was working the night shift with three other CST officers—Officer Novick, Officer Tejera, and Officer Al-Shrawi.

38.     Lieutenant Zabavsky was also on duty, supervising the Fourth Police District's CST officers, including Officer Sutton.

39.     Lieutenant Zabavsky, Officer Sutton, and the accompanying officers were stationed on Kennedy Street, home to Washington D.C.'s most dangerous neighborhood.

40.     According to DOJ court filings conveniently made just after Sutton and Zabavsky's trial, Kennedy Street contains several prolific open air drug trafficking markets operated by a violent gang called the Kennedy Street Crew, or "KDY." As the DOJ would admit in an indictment filed just after Plaintiffs' trial, "[t]he KDY crew is a driver of the cycle of violence associated with drug trafficking and firearms that has plagued the Kennedy Street Neighborhood for years," and caused "a marked rise in crimes of violence and homicides." *United States v. Olugbenga*, No. 23-cr202, Dkt. 38, at 4. From 2019-2023, KDY operated several "prolific 'open air' drug trafficking markets" on Kennedy Street, and used "firearms," "intimidation and acts of violence" to "promote [their] reputations" and "secure their drug trafficking operation." *Id.*, Dkt. 1, at 1, 4. As DOJ admitted after Sutton and Zabavsky's trial, between 2019 and 2023, police seized more than forty firearms—including eight machineguns—from KDY. *See* DOJ Press Release, Armed Carjacking Added to a 55-Count Superseding Indictment Charging Members of the Violent KDY Drug Crew (Feb. 23, 2024), https://www.justice.gov/usaodc/pr/armed-carjacking-added-55-count-superseding-indictment-chargingmembers-violent-kdy-drug.

13

41.     Two of the "prolific 'open-air' drug markets" KDY controlled were located at Fifth & Kennedy, in front of the "Starlight" convenience store, and Georgia Avenue & Kennedy. *See United States v. Sutton*, No. 21-0598, Pretrial Hr'g (10/14/22), at 16-18, 23, 54 (Officer Pitt); Pretrial Hr'g (10/17/22), at 16, 96 (Officer Novick). Shootings attributed to KDY had occurred at both locations. *Id.*, Pretrial Hr'g (10/14/22) at 16-18, 23, 54 (Officer Pitt); Pretrial Hr'g (10/17/22) at 16 (Officer Novick), 149-52 (Officer Scott).[1]

42.     In response to community outrage over shootings at Fifth & Kennedy, the MPD deployed a Crime Suppression Team to do "proactive policing." *Id.*, Pretrial Hr'g (10/17/22) at 16:11-19 (Officer Davis), 109 (Officer Hubyk). CST's mission is to combat violent crime, drugs, and gang activity; it does not target traffic violations or petty crimes. *Id.*, Trial Tr. (11/10/22) at 64:6-10 (Al-Shrawi). CST established permanent police presences, dubbed "fixed posts," at Fifth & Kennedy and Seventh & Kennedy. *Id.*, Pretrial Hr'g (10/14/22) at 25, 33-34, 55-56.

43.     CST officers knew the criminal histories and gang-associations of the individuals who hung out on Kennedy Street. *Id.*, Pretrial Hr'g (10/17/22) at 28 (Officer Novick). They frequently shared intelligence on these matters. *Id.*, Pretrial Hr'g (10/14/22) at 10-11, 35 (Officer Pitt), (10/17/22) at 28 (Officer Novick). CST also used a "beat book" that contained the criminal histories and gang associations of Kennedy Street regulars. *Id.* at 27. CST also gained familiarity with KDY through daily observations. *Id.*, Pretrial Hr'g (10/14/22) at 12-15, 35 (Officer Pitt), (10/17/22) at 26:14-17 (Officer Novick). Indeed, it would be hard to work on Kennedy Street and not know who associated with KDY because "[t]he KDY crew was not very shy about their involvement"; they "flaunted" it. *Id.*, Pretrial Hr'g (10/17/22) at 28:1-5 (Officer Novick).

---

[1] Unless otherwise indicated, all citations are to the trial transcripts and docket in *United States v. Terence Sutton and Andrew Zabavsky*, Docket No. 21-CR-598 (D.D.C.).

## II. While On Duty, Officer Sutton and Lieutenant Zabavsky Received a Report About Gang Related Violence from a Fellow Officer.

44.     Around 10:01 pm on the night of October 23, 2020, Officer Katheryn Pitt reported to Officers Sutton, Novick, and Zabavsky that, earlier that day, she saw Karon Hylton-Brown—a 20 year-old, verified KDY member—"almost get into a fight with another KDY member" at the corner of Georgia Ave & Kennedy. *Id.*, Pretrial Hr'g (10/14/22) at 36:16-25; *see also id.* at 62:16-24. Pitt reported that the fight was about money, *id.* at 47:18-25, and that "[t]here probably would have been a [physical] fight if I wasn't sitting right there," *id.* at 40:18-19.

45.     Pitt further relayed that she saw Hylton-Brown again that day, driving "recklessly" on a moped and crossing-double lines. *Id.* at 42-43, 64-65. Pitt stated that "she had recently seen [Hylton-Brown] back in the area on a moped driving around erratically and not like with a particular purpose of where he was going," *id.*, Pretrial Hr'g (10/17/22) at 43:12-15 (Officer Novick), that is, "driving in a way that indicated he was <u>looking for somebody</u>," *id.* at 67:17-19. Pitt told the CST officers that she believed the altercation she witnessed involving Hylton-Brown earlier that day was indicative of "infighting … between Kennedy Street members." Pretrial Hr'g (10/14/22) at 41:17-19; *see also id.* 36:21-25, 69:5-13.

46.     Based on prior law-enforcement experience patrolling Kennedy Street, intelligence briefings, and familiarity with the "beat book," Hylton-Brown was well known to Officer Sutton, Lieutenant Zabavsky, and Officer Pitt. CST officers saw Hylton-Brown "daily," *id.*, Pretrial Hr'g (10/14/22) at 15:18- 20, 16:8-21 (Pitt) and had "around a hundred interactions" with him, *id.*, Pretrial Hr'g (10/17/22), at 141:23-142:2 (Scott).  As one CST veteran put it, "Hylton[-Brown] was well known," *id.*, Pretrial Hr'g (10/14/22), at 126:10 (Murrock). Multiple CST officers had arrested Hylton-Brown and seized firearms from him. *Id.*, Pretrial Hr'g (10/14/22) at 16 (Pitt), 136-147 (Scott). And new CST officers would be briefed on Hylton-Brown's criminal history and

KDY affiliation. *Id.*, Pretrial Hr'g (10/17/22), at 83:13-17 (Novick), 116-19 (Hubriyk).  MPD officers testified that they saw Sutton interact with Hylton-Brown regularly, that they spoke with Sutton about Hylton Brown's criminal history, and that Sutton knew of Hylton-Brown's KDY association. *Id.*, Pretrial Hr'g (10/17/22) at 116-20, 122 (Hubriyk), 101:21-102:9 (Novick), 141:19-22 (Scott); Trial Tr. (11/4/22 AM) at 29:12-13 (Tejera).

47.    At the time, Officer Sutton and Lieutenant Zabavsky knew of Hylton-Brown's extensive criminal history, which included twenty-one prior arrests for drug distribution, gun possession, and armed robbery, among other crimes. *Id.*, Dkt. 272 Ex. A (MPD Criminal History Report). Some of those arrests resulted in convictions, *id.*, Pretrial Hr'g (10/17/22) at 198:7-10, including for gun possession, *id.* at 141:4-15.

48.    Hylton-Brown was also known by officers, including Plaintiffs, to have a temper: police were repeatedly called to his home for domestic violence complaints, one of which led to a restraining order. *Id.*, Dkt. 272 Ex. A, at 14-18; Dkt. 343, at 1-6. A police report from one of Hylton-Brown's arrests by CST contained—in large red letters under "Caution"—"Assaulted Police Officer," "Threatened Police Officer," and "Violent Tendencies." *Id.*, 10/14/22 Pretrial Hearing, Sutton Exhibit 402.

49.    Officer Sutton and Lieutenant Zabavsky were likewise aware of Hylton-Brown's affiliation with KDY.  MPD intelligence, which was shared with Sutton and Zabavsky, listed Hylton-Brown as a "validated member" of KDY—a designation made by MPD intelligence after a formal administrative process. *Id.*, Pretrial Hr'g (10/14/22) at 104-05, 108-09 (Officer Murrock). Hylton-Brown's KDY affiliation was also listed in the "beat book" described above. *Id.* at 87-89. Moreover, CST officers would frequently see Hylton-Brown at Fifth & Kennedy with known KDY members. *Id.*, Pretrial Hr'g (10/14/22), at 18:3-6, 19:1-7, 52:23-53:4 (Pitt), (10/17/22), at 72:25-

73:3 (Novick), 142:3-7 (Scott). Perhaps the best example of Hylton-Brown's open gang association were videos posted to social media, which showed Hylton-Brown with other known KDY members at Fifth & Kennedy displaying guns, drugs, and cash. *Id.*, Pretrial Hr'g (10/14/22) at 110-11 (Murrock).[2]

50.     Given this background, Officer Pitt's reporting alarmed the CST officers. And the Officers took Officer Pitt's reporting particularly seriously because of her excellent reputation as a shrewd police officer.  A former Army Captain and basketball star, Officer Pitt regularly patrolled Kennedy Street by bicycle, which gave her intimate knowledge of KDY, its members, and its internal politics. *Id.*, Pretrial Hr'g (10/14/22) at 20:4-10; Pretrial Hr'g (10/17/22), at 89-90 (Officer Novick).  Indeed, even the Government's witness testified that Pitt was a very well-regarded officer and credible source of information. Trial Tr. (11/14/22 AM) at 88 (Officer Al-Shrawi).

51.     Officer Pitt explained that different sects of KDY occupied different corners, and Hylton-Brown "didn't frequent the 5400 block of Georgia … he usually frequented the 7th and Kennedy and 5th and Kennedy areas," which made his getting into a fight around 5400 Georgia more concerning. *Id.* at 40:5-9, 41:10-20.  Accordingly, Pitt believed that the near violent dispute between different sects of a violent street gang over money was indicative of "KDY infighting."

52.     The CST Officers who heard Pitt's reporting (Sutton, Zabavksy, and Novick) all "had a consensus that that was kind of odd behavior for [Hylton-Brown] and … were concerned based on his history that retaliation might be a possibility and [ ] thought it was worth trying to locate him and conduct[] a stop." *Id.*, Pretrial Hr'g (10/17/22) at 44:6-10, 71:8-15 (Novick). Certainly, "the fact that Mr. Hylton-Brown had prior arrests for guns and was a validated gang

---

[2] Fourth District officers frequently viewed social media videos created by suspected gang members and shared that intelligence via email. *Id.*, Pretrial Hr'g (10/14/22), at 24- 25 (Pitt), 109-10 (Murrock)

member… contributed" to CST's concerns that Hylton-Brown could be armed and "perhaps back for retaliation." *Id.* at 93:4-11.

### III.    Based on Officer Pitt's Reporting and Hylton-Brown's History, CST Decides to Locate Hylton-Brown and conduct a *Terry* Stop.

53.    At the end of CST's discussion with Officer Pitt, Lieutenant Zabavsky "said something to the effect of let's go find [Hylton-Brown] and walked to his car." *Id.* at 44. Officers Al-Shrawi and Tejera, who would later testify for the government at trial under promises of immunity, did not hear much of Pitt's reporting, Trial Tr. (11/10/22) at 40-41 (Al-Shrawi) ("I wasn't paying attention to her"); Trial Tr. (11/4/22) at 47-49 (Tejera) ("[T]he conversation [with Pitt] took place outside of the vehicle [a]nd I was doing a report in the vehicle in the laptop…. I just don't recall hearing much of it honestly."). But those officers nonetheless confirmed that Pitt reported an altercation involving Hylton-Brown to Sutton, Zabavsky, and Novick, Trial Tr. (11/10/22) at 40-41 (Al-Shrawi), and that, immediately after that conversation, the officers went looking for Hylton-Brown. Trial Tr. (11/4/22) at 47 (Tejera) ("[H]ow did this conversation with the officers at Seventh and Kennedy end? A: Lieutenant Zabavsky went back to his vehicle. Officer Sutton came back into the vehicle and we started driving off."); Trial Tr. (11/10/22) at 45 (Al-Shrawi) ("[H]ow soon after speaking with Officer Pitt do you leave that area? Was it within seconds, minutes, hours? A: Seconds.").

54.    Officer Sutton drove a car with three other CST Officers (Novick, Al-Shrawi, and Tejera), while Lieutenant Zabavsky followed. The officers drove east towards Fifth & Kennedy because that is where Pitt had last seen Hylton-Brown. Trial Tr. (11/10/22 PM) at 48:9-22 (Al-Shrawi), (11/29/22 PM) at 70:3-22 (Novick). At that time, their "intent was to conduct an investigative stop." *Id.* (11/29/22 PM) at 70:3-15 (Novick).

18

**IV.     Hylton-Brown Recklessly Flees from a Lawful Stop.**

55.     When the officers drove east on Kennedy Street, they immediately (at 10:07 p.m.) found Hylton-Brown on the 400 block of Kennedy Street sitting on a moped. *Id.*, Trial Tr. (11/10/22 PM) at 52-54 (Al-Shrawi).

56.     After the officers made a U-turn and pulled behind Hylton-Brown, he began riding the moped on the sidewalk without a helmet. *Id.* at 57:14-23 (Al-Shrawi), (11/29/22 PM), at 72:1-18 (Novick).

57.     When Sutton and Zabavsky pulled up behind Hylton-Brown and attempted to speak to him, Hylton-Brown quickly came off the sidewalk and darted through a redlight to head south on Fifth Street, in the process cutting in front of the CST car and a pedestrian vehicle that was entering the intersection with a green light. *Id.*, Trial Tr. (11/10/22 PM) at 58:11-62:10 (Al-Shrawi), (11/29/22 PM) at 73:5-6, 74:11-17 (Novick), (12/2/22) at 16:13-17:4 (Novick).

58.     This sequence was captured on video:







*Id.*, Gov. Ex. 302 (camera 3 at 10:08:25-30).

59.     Sutton and Zabavsky made left turns and followed Hylton-Brown down Fifth Street, both with their lights on. *Id.*, Trial Tr. (11/29/22) at 74:11-17 (Novick).

60.     When Hylton-Brown briefly stopped, Sutton stated: "hey, let me holla at you"; Hylton-Brown responded, "fuck you" and drove away. *Id.* at 74:3-10.

61.     Hylton-Brown's flight, combined with his criminal history, gang affiliation, and Pitt's reporting, increased CST's suspicion that Hylton-Brown was involved in serious criminality, especially given that Hylton-Brown was known to flee <u>only</u> when in possession of illegal firearms or drugs. CST officers had "around a hundred interactions" with Hylton-Brown that did not result in flight. *Id.*, Pretrial Hr'g (10/17/22) at 141:23-42:15; 143:5-23 (Scott). Out of the approximately one hundred times that CST officers had spoken to Hylton-Brown, he had only fled twice. In one instance, he threw a gun as he fled, *id.*, Pretrial Hr'g (10/17/22) at 136:17-137:25, 140:11-15 (Scott), and in the other, police found MGMA, a digital scale, and $5,168 in Hylton-Brown's car when they eventually caught up with him, *id.* at 145:13-146:20; Sutton Pretrial Hearing Exhibit 402.[3] Moreover, Sutton and Hylton-Brown were known to "talk to each other" and "have humorous banter back and forth," *id.*, Trial Tr. (11/4/22 AM) at 29:11-19 (Tejera), but in this instance, Hylton-Brown was actively avoiding Sutton.

62.     In CST's experience, a KDY member with multiple arrests is not likely to flee unless he is involved in criminal activity. *Id.*, Pretrial Hr'g (10/14/22) at 22:6-13 (Pitt); (10/17/22) at 101:2-19 (Novick).

63.     As Hylton-Brown drove away, Zabavsky and Sutton followed, with Lieutenant Zabavsky taking the lead, now with his lights and sirens activated. The officers "followed Hylton-

---

[3] Officer Scott, who witnessed both of these incidents, testified that he would have told Officer Sutton, as well as the rest of CST, about them. *Id.*, Pretrial Hr'g (10/17/22), at 141:19-22, 147:3-23.

Brown through the neighborhood for approximately two minutes," *id.*, Dkt. 526, at 21, while Hylton-Brown rode on the sidewalk, ran red lights and stop signs, crossed double lines, and drove, in Officer Tejera's contemporaneous words, "crazy," *id.*, Trial Tr. (11/4/22 AM) at 82:3-8 (Tejera); (12/2/22 PM) at 18:1-10 (Novick).

64.     Because Hylton-Brown's moped was incapable of exceeding 30 mph, Indictment ¶20, Sutton and Zabavsky could not have exceeded 30 mph while directly following Hylton-Brown. Rather, Sutton only reached 43 mph when he lost sight of Hylton-Brown. *Id.*, Sutton Ex. 800kk; Trial Tr. (11/4/22 AM) at 66-67, 73 (Tejera), (11/29/22) at 77:24- 78:7 (Novick).

65.     After several blocks, Zabavsky separated from Sutton and Hylton-Brown, but remained in the area.

66.     Sutton followed Hylton-Brown into an alleyway that led back to Kennedy Street. According to the prosecution's evidence at trial, while in the alley, Sutton increased his speed slightly from "[j]ust over 20 miles per hour" to "just over 25 miles per hour," *id.*, Trial Tr. (11/2/22 PM) at 88-89 (Tejera).  But Sutton remained at least 40 feet from Hylton-Brown in the alleyway, *id.*, Trial Tr. (11/30/22 PM) at 11:6-13:25 (Langley).

67.     At the end of the alley, Hylton-Brown tapped his brakes, but then released them and turned left onto Kennedy Street, cutting into the path of a Toyota Scion, which was unable to avoid Hylton-Brown. Hylton-Brwon collided with the Scion, and the force from the impact threw him off his moped onto the street.

68.     Sutton stopped approximately 24 feet from the collision, jumped out of his car and yelled "Karon!" *Id.*, Trial Tr. (11/30/22 PM) at 13:3-7 (Langley); Sutton Ex. 900P. Zabavsky arrived at the scene of the accident approximately 16 seconds after the impact.

69.     Because Kennedy Street has a heavy police presence, many other MPD officers arrived at the scene of the accident within minutes.  Angry citizens, including some angry KDY members, flooded the scene almost just as fast.

70.     The CST officers provided first aid to Hylton-Brown and called an ambulance for him, while Officer Sutton located and interviewed the driver of the Scion. *Id.*, Def. Ex. 100I. Lieutenant Zabavsky assigned an officer to accompany Hylton-Brown to the hospital, to ensure that he received appropriate care, and report back on his medical condition.

71.     Directly following the accident, Lieutenant Zabavsky monitored the scene, ensuring that his subordinate officers were collecting the necessary information so that an accurate report of the event could be produced.

72.     Body camera footage from the evening shows Lieutenant Zabavsky continuously walking from officer to officer to receive the appropriate updates. Lieutenant Zabavsky ensured that information from the striking vehicle was collected; that photographs of Hylton-Brown's moped were taken, including by him; that authorship of the traffic report was assigned; and that officers would be present for the removal of the moped at the conclusion of the information gathering.

73.     Upon returning to the Fourth District station, Lieutenant Zabavsky properly notified his captain of the accident and provided several updates on the status of Hylton-Brown from an officer who accompanied Hylton-Brown to the hospital; carefully reviewed the body camera footage to determine whether what occurred was in fact a police pursuit, as defined as general order of  the Metropolitan Police Chief; appropriately tagged all the body camera footage for review by the Internal Affairs Division; ensured an officer accompanied Hylton-Brown to the hospital and provided him with updates on Hylton-Brown's medical status; and sent a draft copy

23

of the traffic report to those in the Major Crash Unit.

74.    Hylton-Brown died at the hospital three days later from blunt force trauma to the head. At the time of the accident, Hylton-Brown had oxycodone, benzodiazepine, and THC in his bloodstream and $3128 in cash taped to his thighs, concealed beneath his pants. *Id.*, Dkt. Nos. 343, 345, and 382, at 7-10.

**V.    IAD Conducts an Internal Investigation and Refers the Case to the U.S. Attorney's Office for Criminal Prosecution.**

75.    Following the accident, Agent Joseph Della-Camera in the Internal Affairs Division of the Metropolitan Police Department of the District of Columbia was assigned to lead an internal investigation of the incident.

76.    Shortly after midnight on October 24, 2021, Agent Della-Camera conducted what can only be described as a cursory and preliminary investigation. He reviewed body camera footage from only two of the officers involved, traveled to the scene of the crash after the vehicles involved had been removed, made no "effort to identify and interview . . . the members of the crowd who were at the scene," and did not speak with the driver of the vehicle who crashed into Hylton-Brown's moped. *Id.*, Trial Tr. (11/08/22 AM) at 32:11-24 (Della-Camera).

77.    Every fact known to Agent Della-Camera indicated that there was no wrongdoing, let alone any criminal conduct, committed by MPD officers. Instead, the only evidence pointed to the fact that in a high-crime area, officers tried to stop a validated gang member based on a credible report of an ongoing, gang-related altercation, that the suspect fled that lawful stop in a reckless and dangerous manner, that the officers followed him at a low rate of speed, and properly reported the incident to the right channels after ensuring that Hylton-Brown received immediate medical care. Most importantly, because there was absolutely no evidence that either officer's vehicle

made contact with Hylton-Brown's, there was no possibility that a Fourth Amendment violation or a federal civil rights crime had occurred.

78.    Despite the lack of any evidence of criminal conduct and having only conducted a cursory investigation, Agent Della-Camera accused Officer Sutton and Lieutenant Zabavsky of criminal misconduct, revoked the police powers of the four CST officers in Sutton's vehicle, and referred the matter to the U.S. Attorney's Office for the District of Columbia.

79.    Agent Della-Camera's criminal referral was made only eight hours after the incident and was specifically made to Assistant United States Attorney Kendra Briggs within the public corruption and federal civil rights section, despite no evidence that a civil right violation occurred; to the contrary, there was indisputable evidence that a Fourth Amendment violation did *not* occur.

**VI.    The Death of Hylton-Brown Leads to Violent Protests in D.C.**

80.    In the days following Hylton-Brown's death, outrage and violence erupted in Washington, D.C.

81.    Local politicians and community leaders, seeking to capitalize on the incident, accused the officers of killing Hylton-Brown despite the fact that neither police vehicle struck Hylton-Brown's moped. Indeed, in the weeks following the incident (which coincided with the run up to the 2020 presidential election), politicians began pushing the narrative on social media and to media outlets that the officers "murdered" Hylton-Brown.

82.    Perceiving the incident to be part of a pattern of police brutality, which was a particularly sensitive topic in 2020, citizens took to the streets in protest.

83.    These demonstrations, which lasted multiple days, turned violent. Protestors hurled rocks, bricks, improvised explosive devices at police officers over the span of a week. They

25

targeted government buildings, including the police station, and caused hundreds of thousands of dollars in damage.

84.    On one occasion, protesters smashed a squad car window and punched holes in the panes of glass fronting the Fourth District Station of Metropolitan Police Department.



85.    MPD reported that six officers were injured during the protests and that one person was arrested and charged with destruction of property/resisting arrest for "riotous behavior" related to the protest.

86.    This demonstration was one in a string of protests across the country in the wake of the murder of George Floyd that villainized police officers and sought retribution for police brutality. Millions of citizens took part in these anti-police protests, while politicians advocated for policies that defund the police.

87.     These violent protests occurred in the lead up to the 2020 Presidential election in which Joe Biden made police reform a major part of his campaign.  The Biden-appointed U.S. Attorney for the District of Columbia, Matthew M. Graves, subsequently implemented this agenda by making prosecutions of police a top priority, even if doing so required novel and creative legal and factual theories. Indeed, under U.S. Attorney Graves, the U.S. Attorney's Office for D.C. charged more police officers with crimes than the office had in the previous thirty years combined. *See D.C. Officer's Murder Case Stokes Debate Over U.S. Police Prosecutions*, Wash. Post (Sept. 9, 2024), available at https://www.washingtonpost.com/dc-md-va/2024/09/09/dc-police-prosecutions-us-attorney/.

88.     According to the *Washington Post*,  Karon-Hylton's death set off "some of the most volatile anti-police protests [D.C.] had endured since the killing of George Floyd," in which "crowds of demonstrators … lobbed fireworks and projectiles at the lines of law enforcement guarding the [Fourth District MPD] station that became a target of unrest, with police in turn launching sound grenades and more chemical spray to scatter them." https://www.washingtonpost.com/dc-md-va/2021/12/20/karen-hylton-police-protests/; *see also Protest of Deadly Crash in Northwest Washington Becomes Unruly*, Wash. Post (Oct. 27, 2020).

89.     The protestors were particularly upset by the government's initial response to Hylton-Brown's death. In their view, police were not telling the whole story and withholding evidence of wrongdoing from public view.

90.     Accordingly, the MPD, in coordination with the Mayor of D.C., released body-cam footage of the incident in an attempt to appease the protesters and to demonstrate that, contrary to disinformation circulating on social media, Officer Sutton did not hit Hylton-Brown with his vehicle. But releasing the footage only incited more violent protests since the videos did not

27

provide a clear picture of why the officers were following Hylton-Brown, leading to speculation that the officers stopped and followed Hylton-Brown without a lawful basis.

91.    Adding to the protestors' anger was the fact that Hylton-Brown's father, Charles Brown, was arrested at the protest near the 4th District Metropolitan Police Department Station.

92.    Consequently, following the protests related to Hylton-Brown's death, citizens demanded action against the officers, while politicians and law-enforcement were looking for any opportunity to shift blame. For instance, D.C. Councilmember Janeese Lewis George wrote three letters to the U.S. Attorney's Office, urging prosecutors to hold the officers involved accountable, and even held a press conference in front of the U.S. Attorney's Office demanding that Sutton and Zabavsky be indicted just one month before prosecutors brought criminal charges against them. Officers with DOJ and FBI meanwhile, sought to curry favor with the new administration, including U.S. Attorney Graves, whom they knew wanted to see more police charged with crimes.

## VII.    Needing a Scapegoat, the United States Criminally Prosecutes Sutton and Zabavsky Without Probable Cause.

93.    Based on the false and misleading information and improper recommendations provided by FBI and DOJ agents, including FBI Special Agents Luke Brunot and Jynika Craig and DOJ Special Agents Sean Ricardi and Mark Fitzgerald, the U.S. Attorney's Office for the District of Columbia—needing a scapegoat for an incident that occurred amidst the nationwide civil unrest in 2020 and wishing to curry favor with the new administration—caused Officer Sutton and Lieutenant Zabavsky to be indicted, arrested, and prosecuted without probable cause.

94.    The U.S. Attorney's Office sought the indictments without obtaining approval or even consulting with the U.S. Department of Justice's Civil Rights Division, despite the Justice Manual's requirement that it do so at least ten days before presenting an indictment to the grand jury, *see* Justice Manual § 8-3.130, and despite the obvious significance and novelty of the charges.

28

95. Defendant's agents caused Sutton to be charged with second degree murder, in violation of D.C. Code § 22-2103, relying primarily on the allegation that Sutton violated a provision of the MPD police chief's general order that "prohibits officers from 'pursuing a vehicle for the purpose of affecting a stop for a traffic violation.'" *See* MPD General Order 301.03.

96. Defendant's agents also caused Sutton to be charged with Obstruction of Justice and Conspiracy to Obstruct Justice based primarily on statements Sutton made to his watch commander and in a draft report that allegedly "minimized the extent of observable injuries to Hylton-Brown." Indictment ¶¶ 46-47. Sutton's statements, however, were made just over an hour after the accident, before he had received word from the hospital of Hylton-Brown's injuries. Moreover, because Sutton interviewed the driver of the Scion while other officers tended to Hylton-Brown, Sutton did not have first-hand knowledge of the extent of Hylton-Brown's injuries. The government also faulted Sutton for telling his watch commander that "we were following Hylton-Brown for … two minutes," when the Government alleged the actual time was three minutes and nine seconds. *Id.* ¶ 46(c). These alleged misrepresentations were trifling and did not materially obscure the facts.

97. Defendant's agents likewise caused Zabavsky to be charged with Obstruction of Justice and Conspiracy to Obstruct Justice for allegedly "with[olding] information concerning his own involvement in the pursuit" and stating that "Hylton-Brown had been drunk and had been slurring his words." *Id.* ¶ 46(d) & (e). Zabavsky's statements, however, were made shortly after the accident and accurately conveyed that Hylton-Brown was under the influence of drugs at the time of his death.

98.     These criminal prosecutions were initiated without probable cause and lacked any basis in law or fact.  They could only have been motivated by malice and improper political motives.

99.     With regard to Sutton's murder charge, the federal agents relied on a theory that D.C. courts have repeatedly rejected, specifically, that a police chase becomes legally "reckless" if it violates an internal police rule.  In addition, D.C. caselaw makes it clear that even 80 mph police pursuits do not constitute "reckless" conduct, whereas it was undisputed that Hylton-Brown was driving a rented moped that could not exceed 30 mph. Finally, the federal agents completely ignored that Officer Sutton had an obvious law enforcement privilege defense: *i.e.*, that, as a law enforcement officer, Officer Sutton was authorized to use reasonable force to effectuate a lawful stop especially where, as here, he objectively had reasonable suspicion to believe that Hylton-Brown was involved in an ongoing gang-related dispute and was in possession of contraband, as supported by, among other undisputed facts, the high crime area, Officer Pitt's specific tip of a gang related alteration that day, Hylton-Brown returning to the area the night of the altercation and driving around aimlessly as if "looking for someone," Hylton-Brown's 21 prior arrests and status as a validated gang member, Hylton-Brown's unprovoked flight, and Hylton-Brown's history of only fleeing police when in possession of guns or drugs.  On those facts, the existence of reasonable suspicion of a crime, beyond a mere traffic violation, is inarguable.  Certainly, any competent law enforcement agent would know that these facts easily supported reasonable suspicion of a crime beyond a traffic infraction.

100.    The obstruction of justice charges against both officers were similarly baseless, propped up only by misleading information and empty assurances from the DOJ and FBI agents.

101. Indeed, the charged obstruction statute makes it a crime to "prevent the communication to a [federal] law enforcement officer … information relating to the commission or possible commission of a Federal offense," 18 U.S.C. § 1512(b)(3), whereas Supreme Court precedent foreclosed the possibility of a civil rights violation (and thus any "possible commission of a federal offense") where, as here, a police chase ends in an accident between a fleeing suspect and a third-party vehicle without any contact between the officer's vehicle and the suspect's. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

102. The DOJ and FBI agents who maliciously caused this prosecution and indictment, moreover, never explained what federal crime was committed or even possibly committed. Instead, they simply testified that the federal prosecutor prosecuting Officer Sutton and Lieutenant Zabavsky *told them* that there was a federal civil rights investigation. As the investigating agents, including and especially Agents Ricardi well-knew, a conclusory hearsay statement from the prosecutor cannot create probable cause for an element of a crime.  This is especially true where, as here, the prosecutor's conclusory claim was contradicted by clearly established Supreme Court precedent making it obvious that there could not be a possible federal civil rights crime where, as here, a fleeing suspect collides with a third party and is untouched by any police vehicle. Moreover, well after the accident, Agent Ricardi informed Officer Zabavsky that he was not a target of any federal investigation.  This strongly suggests that the obstruction charges—with no plausible underlying federal offense—were invented well after the fact under pressure from a Justice Department that was desperate to show it was tough on prosecuting police.

103. With regard to the conspiracy charge, the prosecution's case was similarly without merit, insofar as it relied upon baseless underlying obstruction of justice theory. Furthermore, the prosecution was unable to point to any evidence of an agreement between Lieutenant Zabavsky

and his co-defendant to engage in criminal conduct, instead transforming a brief and indecipherable conversation at the scene of the accident into a supposed moment of conspiracy, despite no further indications of such.

104.    Beyond the baseless nature of the charges, throughout the entirety of the proceeding, the members of the prosecution team, including FBI, MPD, and DOJ agents, engaged in misconduct to secure an improper indictment and conviction.

105.    For one, the prosecution team proffered blatant falsities to the jury. For instance, the prosecution falsely claimed that Sutton pursued Hylton-Brown solely for traffic violations. Prosecutors told the jury: "Hylton's crime that night [was] driving a moped on a sidewalk without a helmet. For this, Sutton chased Hylton" to his death, Trial Tr. (10/25/22 AM at 46:3-6), and that "the petit offense that started all of this [was] that Hylton had been riding on the sidewalk without wearing a helmet… this was the reason … why it happened." *Id.* at 63-64. In reality, what actually "started all of this" was Officer Pitt's reporting of potential gang-violence. Although the prosecutors were the ones who made these false and misleading statements to the jury, the agents named above were fully complicit in pressing the false narrative that Plaintiffs attempt to stop Hylton-Brown simply for "riding on the sidewalk without wearing a helmet."  Indeed, as outlined below, the FBI and DOJ agents named herein took a number of steps to further that false narrative, including but not limited to intimidating and retaliating against officers who dared to contradict it. Moreover, Agent Ricardi sat at counsel's table with the prosecutors nearly every day of trial, helped the prosecutors prepare witnesses and jury addresses, and built the case from the ground up.  Agent Ricardi knew and actively supported the false narrative that drove this entire investigation and trial: i.e., that Hylton-Brown was stopped and pursued solely for not wearing a helmet.

32

106.    The prosecution also misled the jury in its opening and closing statements by repeatedly stating that the officers were charged with "covering up" a murder. In fact, murder is a D.C. Code offense, and consequently, the Government was required to prove Sutton and Zabavsky "covered up" a different crime—one that is actually a "federal crime," or at least a "possible" one. The prosecution and its agents, of course, were keenly aware of that throughout this baseless prosecution.  The prosecution had to resort to misleading the jury about its burden to prove a federal nexus because the DOJ and FBI agents on the prosecution team knew there was no such nexus to begin with.  Accordingly, the DOJ and FBI agents named above, including Agent Ricardi conspired with the prosecutors to present this misleading information to the jury.  Agent Ricardi and the prosecutors similarly presented misleading information and instructions to the grant jury that indicted Plaintiffs in order to mislead the grant jury into believing that the crime underlying the obstruction charges was murder, rather than facing their burden of showing probable cause of an underlying "possible federal crime."

107.    In addition to misrepresenting facts, the prosecution team, supported by Agent Ricardi and others, fought to exclude highly exculpatory ones. Most notably, the prosecution team, including Agent Ricardi, withheld evidence of Hylton-Brown's gang membership.  Indeed, just three months after Plaintiffs' trial, the FBI sought and obtained an indictment of seventeen members of the Kennedy Street Crew, including several of Hylton-Brown's close associates *See* DOJ Press Release, *Armed Carjacking Added to a 55-Count Superseding Indictment Charging Members of the Violent KDY Drug Crew* (Feb. 23, 2024), https://www.justice.gov/usao-dc/pr/armed-carjacking-added-55-count-superseding-indictment-charging-members-violent-kdy-drug.  That gang investigation contained evidence concerning Hylton-Brown, including that the

DOJ had issued a preservation letter for his Instagram account, that the DOJ and FBI, including the DOJ and FBI agents named above, withheld from Plaintiffs until after trial.

108. The prosecution team then convinced the judge to exclude from trial the evidence that Sutton and Zabavsky did have of Hylton-Brown's known association with KDY, as well as Hylton-Brown's 21 prior arrests and the $3128 cash taped to his thighs at the time that he fled police. In order to exclude this evidence, the Prosecution Team, with the knowing support of Agent Ricardi and others, repeatedly minimized the extent and dangerousness of KDY and feigned ignorance of particular KDY gang members who were Hylton-Brown's associates.

109. Indeed, perhaps the best example of Hylton-Brown's open gang association were videos posted to social media, which showed Hylton-Brown with other known KDY members at Fifth & Kennedy displaying guns, drugs, and cash. Pretrial Hr'g (10/14/22) at 110-11 (Murrock).[4] An MPD intelligence officer called by the defense identified the individuals in these videos as Hylton-Brown, Khali Brown, Antoine Baily, and Meko Brown. *Id.* at 110, 113. The prosecution feigned ignorance about those individuals, *id.* at 116:4-10, suggested the guns in videos were merely "props," *id* at 114:8-14, and mocked the idea of "Hylton being somehow associated with KDY," (10/17/22) at 193:21-22. However, at the very same time, DOJ was drafting an indictment, which it waited to drop three months after Sutton's trial, charging Bailey and Khali Brown with committing numerous crimes on behalf of KDY, including assault with a deadly weapon, carrying a machine gun during a drug trafficking offense, and possessing a firearm with an obliterated serial number. *See* No. 23-cr-202, Dkt. 1, Counts 1, 7-10, 13, 17. Meko Brown was also a known KDY

---

[4] Fourth District officers frequently viewed social media videos created by suspected gang members and shared that intelligence via email. Pretrial Hr'g (10/14/22), at 24-25 (Pitt), 109-10 (Murrock).

member who was "caught on surveillance video discharging a firearm at 7th and Kennedy." Pretrial Hr'g (10/14/22), at 26:5-7.

110.    Agent Ricardi, along with the prosecutors, similarly minimized and omitted Hylton-Brown's gang membership and criminal history in his testimony before the grand jury in order to procure the indictment of Plaintiffs.

111.    Beyond misrepresenting the facts, the prosecution team engaged in spoliation of exculpatory evidence. Due to what the prosecution called a "miscommunication with fleet management and [agents] at IAD," the vehicle that Sutton was driving "was sold at auction." At the same time, the prosecution claimed that the vehicle did not have a "black box," which would have recorded the exact speed of the cars and would have rebutted the prosecution's claims about Sutton's speed.

112.    Having kept key information from the jury (and some from the defense), the prosecution, in conjunction with the FBI and DOJ agents named above, falsely claimed in closing that Hylton-Brown "wasn't doing a damn thing wrong," Trial Tr. (12/14/22 PM) at 72:6-8, when stopped by Sutton and that Sutton chased Hylton-Brown "simply for minding his own business," *id.* at 64:3-5. The agents named above who participated in this investigation and trial knew that was false and yet actively worked with the prosecutors to press this false narrative. They knew that Officer Pitt reported to Officer Sutton and Lieutenant Zabavsky that Hylton-Brown was involved in a gang-related altercation that day and had fought to keep that information from the jury. The DOJ, including the law enforcement agents named above, also knew that Hylton-Brown had 21 prior arrests and was a validated member of a dangerous street gang that DOJ itself was preparing to indict. Yet, after successfully excluding all of this information, the prosecution and

35

the agents named above weaponized that ruling to create an affirmative false impression that Officer Sutton "chased Hylton" to his death simply for not wearing a helmet.

113.    Officer Sutton and Lieutenant Zabavsky were convicted after a trial in which they were not permitted to present a complete and meaningful defense and in which exculpatory evidence was withheld from the jury and affirmatively misrepresented.

114.    The district court also prohibited Sutton from raising a law enforcement privilege defense. At common law, "an intentional killing was 'justifiable,' and thus no crime, if it was 'commanded or authorized by law.'" *Comber*, 584 A.2d at n.16. And D.C. courts have repeatedly recognized that police have common law immunity when using reasonable means to affect a lawful arrest. The district court, on the prosecution's motion, nonetheless refused to instruct the jury on this defense because it wrongly believed that D.C. does not recognize common law defenses. Dkt. 530, at 17. The court's retroactive abrogation of law enforcement privilege has startling implications: if taken seriously, it would mean that D.C. police commit assault, battery, and kidnapping every time they make an arrest.

115.    Officer Sutton was not even given a meaningful opportunity to show that he complied with the General Order. The jury was not instructed on the concept of a *Terry* stop, which would have supported Sutton's defense that "the pursuit" was primarily to effect a *Terry* stop and not "for the purpose of affecting a stop for a traffic violation." Indictment ¶ 8 (quoting the General Order). Nor was the jury instructed that reckless flight from police is a felony, which would have allowed Sutton to counter the government's claim that he violated the General Order by chasing Hylton-Brown over a misdemeanor.  This instruction failure was especially prejudicial because the prosecution team weaponized it by repeatedly eliciting misleading testimony that fleeing from police was merely a misdemeanor. *See* Trial Tr. (11/2/22 PM), at 54:14-19, 61:7-10 (Tejera). When

36

the defense sought to clarify that fleeing police "in a reckless manner is a felony," the prosecution successfully objected. *Id.* (11/4/22 AM) at 74:12-19. The prosecution team, supported by Agent Ricardi, even sponsored false expert testimony that, if the subjects of a traffic stop "want to flee, if they want to not be stopped by police, they have the right to do so." *Id.* (11/15/22 PM) at 57:15-18.

116.    Most egregiously, the district court excluded Hylton-Brown's criminal history and KDY-affiliation, and Officer Pitt's statement that she believed Hylton-Brown was involved in ongoing KDY "infighting." The district court found that the word "infighting" prejudicial because it is "fraught with gang-related … implications." Trial Tr. (11/28/22 PM) at 61:2-7. But that was the exact word that Officer Pitt used when briefing Officers Sutton and Zabavsky on the altercation she observed between Hylton-Brown and another known KDY member. Having heard that word from Officer Pitt, Officers Sutton and Zabavsky were reasonably concerned about the exact "gang-related implications" that the court deemed prejudicial. But, instead of being allowed to tell the jury what she actually told Officers Sutton and Zabavsky just seconds before they went to find Hylton-Brown, Pitt was only allowed to testify that she "ha[d] concerns about what [she] had seen based upon [her] experience." *Id.* at 62:10-13. By stripping away the gang-related context, Sutton and Zabavsky were robbed of the chance to show that they were motivated—not by enforcing helmet laws, as the DOJ claimed—but by CST's core reason for being stationed on Kennedy Street in the first place: to stop gang violence before it starts.

117.    Similarly, Officer Sutton and Lieutenant Zabavsky were precluded from meaningfully contesting a key element of the obstruction charge—that the "information" allegedly withheld "relat[ed] to the commission or possible commission of a Federal offense," 18 U.S.C. § 1503—because the district court refused to instruct the jury on the nature or elements of the

underlying federal civil rights statute and forbade Sutton and Zabavsky from "argu[ing] that the facts of this incident do not establish a federal civil rights violation." Trial Tr. (12/14/22 AM) at 12:4-10. The prosecution, supported by the FBI and DOJ officers named above, filled this instructional void by falsely suggesting that Sutton was charged with obstructing the investigation of the alleged murder.

118.    Officer Sutton and Lieutenant Zabavsky were sentenced to 66 months in prison, followed by three years of supervised release, and 48 months in prison in December 2022, followed by three years of supervised release, respectively.

### VIII.   Agents of the Defendant Took Steps To Intimidate Witnesses Who Might Testify Truthfully In Favor of Officers Sutton and Lieutenant Zabavsky and Retaliated Against Those Who Were Brave Enough to Defy Them.

119.    Throughout this malicious investigation, prosecution, and trial, the United States, including and especially Agents Ricardi and Della-Camera, made clear that any police officer or agent who provided information that conflicted with the Government's narrative that Hylton-Brown was pursued simply for not wearing a helmet would face consequences. This included, for instance, making sure that members of the internal affairs division were present and visible whenever an MPD officer was called by the defense to testify.

120.    Despite these threats, Officers Pitt and Novick bravely testified about the truth of what happened that night. Indeed, both officers testified that Officer Pitt informed Officers Sutton, Zabavsky, and Novick that Hylton-Brown was involved in an altercation earlier that day and was now back in the area driving around as if "looking for someone." Both video evidence and the prosecution's own witnesses confirmed that this conversation occurred and that, within seconds, Sutton, Zabavsky, Novick, along with two other officers, left their "fixed post" and immediately located and tried to stop Hylton-Brown.

121. Although called to the stand as a witness for the prosecution, Officer Novick was subjected to repeated attacks about his credibility by prosecutors. Officer Novick was aggressively crossed and re-crossed by the prosecution on the question of whether Hylton-Brown was stopped and pursued solely for riding his moped without a helmet or whether the officers had reasonable suspicion that Hylton-Brown had committed or was about to commit a more serious, non-traffic offense. Officer Novick's position that the officers had reasonable suspicion of a non-traffic offense was unquestionably correct as a matter of law and fact. Indeed, it was undisputed that five police officers left a fixed post in a high crime neighborhood to go find Hylton-Brown based on Officer Pitt's reporting of a suspected gang-related altercation. And the officers could not possibly have been searching for Hylton-Brown to stop him for traffic offenses because they had no way of knowing that Hylton-Brown would commit traffic offenses when they found him.

122. Nevertheless, the prosecution tried to get Officer Novick to falsely testify that his suspicions were based solely on Pitt's reporting when, in realty, they were based on Pitt's reporting combined with Novick's knowledge of Hylton-Brown's criminal record and gang affiliation. Prosecutors, over objection, badgered Officer Novick with repetitive questions to that effect, including "you had no tips or anything suggesting [Hylton-Brown] had been involved in any criminal activity that day, right?" Trial Tr. (12/1/22 PM) at 76:8-10, and "nothing other than what Officer Pitt told you indicated [Hylton-Brown] was going to be involved in a crime that night, right?," *id.* at 77:3-5; *see generally id.* at 76-80. Officer Novick struggled to answer these questions without violating the court's order excluding evidence of Hylton-Brown's known gang membership, Officer Pitt's report of suspected KDY-infighting, and Hylton-Brown's 21 prior arrests.

123.     When Officer Novick began to respond to these questions truthfully by explaining that "[w]e already had our preexisting knowledge…" the court cut him off. *Id.* at 78:23-25. The prosecution compounded the problem, claiming that Officer Novick's concerns were "based entirely on what Officer Pitt told you" and that "You had no other information about [Hylton-Brown] that day?" *Id.* (12/2/22) at 13-15. The most Officer Novick could say to defend himself was "No, just my prior knowledge." *Id.* at 13:13-14. The prosecution also asked twenty-five questions emphasizing that no one saw Hylton-Brown with a gun "that day." *Id.* at 11-12, 24-27.

124.     In closing, the prosecutor improperly injected his own assessments of credibility, telling the jury that—in the prosecutor's opinion—Officer Novick and Pitt's concerns about Hylton-Brown were fabricated, stating "***I am not … fully crediting***" their testimony and "neither should you." Trial Tr. (12/14/22 PM) at 72:19-21.

125.     Defendant's agents, including Agents Ricardi and Della-Camera and others in the D.C. U.S. Attorney's Office, made good on their threats to retaliate against officers for truthfully testifying in favor of Officers Sutton and Zabavsky. In December 2021, for instance, Agent Ricardi and other FBI and DOJ agents caused IAD to contact the Calvert County Sheriff's Office to dissuade the office from offering Officer Novick employment. Later, Agent Ricardi and other DOJ and FBI agents caused Officer Novick to be put on the "Lewis List." The Lewis List is an internal list that the Government keeps of officers who are deemed uncredible. As the Government well knew, merely being placed on the Lewis List can end an officer's career. Indeed, that was the point.

126.     Novick was never notified when he was placed on the Lewis list or what evidence the determination was based on. But it is clear that the FBI and DOJ agents named above put Novick on the Lewis List as retaliation for the truthful testimony he gave at Plaintiff's trial.

127. Officer Novick was terminated from a federal position he had taken as a Deputy U.S. Marshal, with the U.S. Marshals Service, simply for being on the Lewis list.

128. Officer Novick's placement on the Lewis list was not based on any legitimate concerns about his testimony or behavior but was designed to retaliate against him for this truthful testimony in Plaintiffs' case. The Government's intimidation and retaliation against Officer Novick and others who truthfully testified that there was reasonable suspicion that Hylton-Brown was involved in a non-traffic crime on the night of his death underscores the maliciousness of this entire prosecution.

129. A similar story unfolded with respect to the defense's witnesses. Capitalizing on MPD orders that require officers to cooperate with IAD and the U.S. Attorney's Office, the Government's agents, including Agent Ricardi and Agent Della-Camera, forced the officers who were expected to testify at Sutton and Zabavsky's criminal trial to speak with the prosecution team to help them prepare their questions. If the officers refused or did not parrot the Government's narrative, agents made clear that they could face consequences, including placement on the Lewis list.

130. For example, in response to Agent Ricardi's request to speak with Officer Tyler Toth—one of the defense's witnesses—before trial, Officer Toth asked Ricardi if he "had to talk to him." Because Officer Toth pushed back, he was punished. When Officer Toth attempted to obtain a warrant using his signature, a prosecutor told him that he needed a different officer to sign the warrant, indicating that Officer Toth was now on the Lewis list.

131. Defendant's intimidation campaign went well beyond the police force. On one occasion, Agent Ricardi coerced a witness possessing exculpatory evidence to recant his statements to police through implicit threats. That individual, Chinedu Ukeekwe, had witnessed

41

the Hylton-Brown's crash and, after seeing news of Sutton and Zabavsky's indictment, contacted the MPD because "he felt a strong compulsion to relay his [story] to authorities so that the officers would not be wrongfully accused of something they hadn't done." Defs' Ex. 11. On September 25, 2021, Mr. Ukeekwe had a conversation with MPD Officer Michael Price where he stated that on the night of the crash, "he was in the area of Kennedy Street NW traveling home from work" when he "saw Hylton stop and throw something as police were making contact with him." *Id.* According to Mr. Ukeekwe, "the MPD vehicle slowed down to see what was discarded" and "then continued to flow Hylton." *Id.*

132.    Less than three days later after these statements were made to police, Agent Ricardi ensured that Mr. Ukeekwe did not ruin his criminal prosecution. Although there was no reason to believe that Mr. Ukeekwe, a disinterested eye witness whose motivation was ensuring that no one was wrongfully convicted, Agent Ricardi told Mr. Ukeekwe "just say you lied and you'll never see me again."  Ukeekwe ultimately stated, through counsel, that he did not want to testify at trial.

## IX.    President Trump Grants Officers Sutton & Lieutenant Zabavsky Full Pardons on His Third Day Back in Office

133.    On January 22, 2025, President Trump ended this nightmare by granting Officer Sutton and Zabavsky "full and unconditional" presidential pardons. *See* White House, Executive Grant of Clemency for Terence Sutton (Jan. 22, 2025), https://perma.cc/3WZX-LWVR; White House, Executive Grant of Clemency for Andrew Zabavsky (Jan. 22, 2025), https://perma.cc/H3HD-USFW.

134.    Then Acting U.S. Attorney for the District of Columbia Ed Martin publicly praised these pardons and noted in an open letter to law enforcement officers that the pardons had righted a wrong because Officer Sutton and Lieutenant Zabavsky had been "wrongfully convicted of a bogus charge."

135.    In light of these pardons, the U.S. Court of Appeals for the D.C. Circuit vacated Sutton and Zabavsky's convictions and remanded with instructions to dismiss the cases as moot.

136.    On February 25, 2025, the criminal cases against Sutton and Zabavsky were finally dismissed by Judge Friedman, ending three years of legal proceedings that caused devastating damage.

### X.    While the Charges Against Plaintiffs Have Been Dropped, Plaintiffs Suffer Continued Economic, Mental, Emotional, and Reputational Harm.

137.    Although both officers were ultimately pardoned and reinstated to the police force, Officer Sutton and Lieutenant Zabavsky suffered serious harms as a result of this malicious prosecution, false arrest, and false imprisonment.

138.    In total, Officer Sutton's cognizable damages amounted to $5 million.

139.    In total, Lieutenant Zabavsky's cognizable damages amounted to $10 million.

### A.    Officer Sutton and Lieutenant Zabavsky Suffered Extreme Economic Loss.

140.    As a result of their indictment, Officer Sutton and Lieutenant Zabavsky lost their jobs and were forced to sell their homes, as they were no longer able to make their mortgage payments.

141.    Lieutenant Zabavsky was additionally forced to sell his car to make up for the lost wages.

142.    While Officer Sutton managed to find short-term employment at both a grocery store and a roofing company, none of the jobs was comparable to his employment at the Metropolitan Police Department in terms of experience, pay, or prestige.

143.    Most notably, Officer Sutton incurred legal fees of approximately $1.5 million to obtain counsel to represent him during the investigation, trial, and appeal.

144.    Lieutenant incurred legal fees of approximately $219,000 to obtain counsel to represent him during the investigation, trial, and appeal. To finance his defense, Lieutenant Zabavsky also was forced to exhaust all of his savings, including funds in his 457 plan. He ultimately owed the IRS thousands of dollars in penalties for utilizing those funds. As a result, Lieutenant Zabavsky was forced to live on credit cards for some time, which he could not pay off in a timely manner, leading to the total destruction of his credit score. Lieutenant Zabavksy went from a credit score of roughly 850—representative of a life of smart fiscal behavior—to the mid-300s.

**B.    Officer Sutton and Lieutenant Zabavsky Experienced Acute Deprivations of Liberty.**

145.    Initially, Officer Sutton was placed on full house arrest, beginning on September 27, 2021. However, the court modified the conditions of his release in October 2021, granting him a curfew of 10 PM. Though he was able to move within the state of Maryland between 6 AM and 10 PM, he was forced to wear an ankle monitor from September 2021 until his pardoning in January 2025. The ankle monitor was a source of embarrassment, so much so that Officer Sutton refrained from wearing shorts for four years, even in the DC summer heat, and avoided family vacations and other social events where shorts would be the social norm. In the meantime, Officer Sutton was not permitted to travel outside the state, meaning he missed numerous family vacations and valuable time with his loved ones.

146.    Upon arraignment in September of 2021, Lieutenant Zabavsky was placed on a curfew of 10 PM. Though he was able to move within Washington D.C. (excluding the Fourth District) between 6 AM and 10 PM, he was forced to wear an ankle monitor from September 2021 until September 2024. The ankle monitor was a source of embarrassment. In the meantime,

Lieutenant Zabavsky was not permitted to travel outside the state, meaning he missed numerous trips with family and friends and valuable time with his loved ones.

147.    Additionally, for the duration of his trial, Lieutenant Zabavsky was caring for his elderly mother in Pennsylvania, who currently suffers from dementia. Each weekend, Lieutenant Zabavsky would travel to Pennsylvania to stay with her and rush back to Washington D.C. to ensure that he was back before curfew on Monday mornings, adding a layer of extreme stress to an already distressing and upsetting situation.

**C.      Officer Sutton and Lieutenant Zabavsky Experienced Strong Degrees of Reputational Harm.**

148.    Countless news articles were published discussing the death of Hylton-Brown and maligning the officers as responsible for his death. These articles normally parroted the FBI and DOJ's misleading and hyperbolic allegations, such as claiming that Officer Sutton "murdered" Kyron Hyton-Brown and falsely stating or implying that Sutton pursued Hylton-Brown solely for minor traffic infractions.

149.    For instance, in a DOJ press release that is still available online today, former U.S. Attorney Mathew Graves claimed that Officers Sutton and Zabavsky were convicted "for their roles in the murder of Karon Hylton Brown and a related cover up." *See* DOJ Press Release, Two MPD Officers Sentenced for 2020 Murder of Karon Hylton-Brown and Subsequent Coverup (Sept. 12, 2024), https://www.justice.gov/usao-dc/pr/two-mpd-officers-sentenced-2020-murder-karon-hylton-brown-and-subsequent-coverup.

150.    The DOJ press release then misleadingly describes the incident has having begun when "officers observed Mr. Hylton-Brown, 20, driving a moped, helmetless, on a sidewalk." The strong implication is that Sutton and Zabavsky simply observed an *unknown* 20 year-old and just decided to stop and subsequently chase him *because of* his lack of a helmet.  In reality, the officers

were looking for Hylton-Brown because of Officer Pitt's report of possible gang-related violence, as well as Hylton-Brown's extremely concerning arrest history and validated gang membership.

151.    Countless media reports have parroted DOJ's misleading narrative.  CNN, for instance, on January 23, 2026, published an article claiming that Officer Sutton "spotted Hylton-Brown driving a moped helmetless and pursued him at high speeds."  When confronted on how CNN could possibly call a chase "high speed" when it was undisputed that Hylton-Brown's vehicle was incapable of exceeding 30 mph, and on the misleading nature of implying this was a random stop based solely on the lack of a helmet, CNN made clear that it was relying on claims made by the DOJ at trial and in press releases.  While CNN did ultimately change "high speed" to "unreasonable speed," and mentioned the defense's theory of the case after Sutton's counsel complained, Sutton and Zabavsky could not possibly correct all of the misleading reports about them, especially when the media, by its own admission, was simply parroting the false, misleading, and hyperbolic allegations of the prosecution team. The dishonest attacks on Officer Sutton and Lieutenant Zabavsky's character was led by federal officials, and unfortunately, most of this material remains online and freely accessible.

152.    Despite being pardoned, Lieutenant Zabavsky's conviction still shows up on background checks, causing lasting reputational harm. For instance, he was denied "pre-Check" clearance from the Transportation Security Administration and was denied the ability to purchase a firearm because he still shows up in the system as a convicted felon.  And the IAD continues to cause derogatory reporting about Officer Sutton to appear in internal MPD records, despite promising they would cease doing so. As IAD well knows, this reporting can and likely will seriously harm Officer Sutton's law enforcement career.

**D.      Officer Sutton and Lieutenant Zabavsky's Personal Relationships Suffered.**

153.    Many of Officer Sutton's closest friends were those whom he had worked alongside on the Crime Suppression Team for nearly a decade. However, following the initiation of the investigation into Officer Sutton, Officer Sutton was prohibited from having *any* contact with CST members, as well as anyone who was on patrol the night of Mr. Hylton-Brown's death, leading Officer Sutton to feel very isolated during one of the most difficult periods of his life.

154.    Similarly, Lieutenant Zabavsky was unable to travel with friends or visit those living out-of-state. And many of his local friends from the Metropolitan Police Department were not permitted to have contact with him. The U.S. Attorney's Office presented a list of nearly two dozen individuals, almost all of whom were his MPD friends and colleagues, who were prohibited from having contact with him for the duration of the legal proceedings, which lasted several years. Furthermore, police in uniform were not permitted to show up in court to show support for either Lieutenant Zabavsky or his co-defendant.

**E.      Officer Sutton Experienced Psychological Harm.**

155.    Officer Sutton experienced psychological distress following his conviction when he realized that he was viewed by society as a murderer, distress that was exacerbated by the Government's overheated rhetoric. Though Officer Sutton had never been suspended in his entire professional career as a police officer, he suddenly found himself a convicted murderer struggling to find work.

**F.      Lieutenant Zabavsky Experienced Serious Health Problems, Including a Stroke.**

156.    Lieutenant Zabavsky experienced extreme health consequences as a result of the stress of the prosecution, suffering a stroke directly after his sentencing. Having experienced the stroke late at night, Lieutenant Zabavsky waited to seek medical care, so as not to break curfew,

delay which may have caused severe additional harm. A special order ultimately had to be filed to allow for the removal of the ankle monitor so that doctors could properly diagnose him. The stroke took several months to recover from: for a period of time, Lieutenant Zabavsky lost the ability to properly walk, talk, and utilize his fine motor skills. During this period, Lieutenant Zabavsky could not drive, and therefore, he could not care for his mother.

157.    Lieutenant Zabavsky suffered additional health consequences as well. Over the three-year period of his prosecution, Lieutenant Zabavsky grinded through six teeth due to chronic stress. His sleep apnea worsened, becoming more frequent. He smoked more cigarettes. He forwent an examination of a knee injury due to concerns over getting a court order to have the ankle monitor removed. In total, his body absorbed the stress of the entire ordeal in profound and irreversible ways.

## COUNT I
### 28 U.S.C. § 2674 – Malicious Prosecution in Violation of the Federal Tort Claims Act

158.    Plaintiffs reallege and incorporate by reference the above paragraphs as if fully alleged herein.

159.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

160.    Plaintiffs have exhausted their administrative remedies under 28 U.S.C. § 2675 of the Federal Tort Claims Act as a prerequisite to instituting a claim against the United States for money damages for injury or loss of property or personal injury caused by the negligent or wrongful act or omission of any employee of the United States government while acting within the scope of his or her office or employment.

161.    By letter dated June 13, 2025, Plaintiffs presented their administrative claim to the DOJ. In response, the DOJ sent a letter dated August 19, 2025, asking for proof of representation. Counsel for Officer Sutton and Lieutenant Zabavsky then properly provided a retainer agreement, singed by counsel and by Officer Sutton and Lieutenant Zabavsky, as evidence of the authority to represent the claimants.  While portions of the letter related to third-party funding and disclosures of possible conflicts of interest were redacted, the headings for those paragraphs were unredacted, thus clearly identifying the content of the redacted position. The DOJ did not respond to Officer Sutton and Lieutenant Zabavsky's August 19, 2025 letter for over six months.

162.    The DOJ has not made a final disposition within the prescribed statutory deadline to Plaintiffs' Form 95 submissions and, therefore, their Form 95s are, as of the filing of this Complaint, deemed denied, exhausting Plaintiffs' administrative remedies and granting them the right to sue in this Court.

163.    Defendant United States is responsible for the actions of its investigative or law enforcement officers, or officers with supervisory authority over such officers who are investigative or law enforcement officers within the meaning of 28 U.S.C. § 2680(h).

164.    Defendant United States, through its investigative and law enforcement officers, maliciously investigated and procured the prosecution of Plaintiffs by initiating and continuing a baseless criminal investigation and by bringing criminal charges lacking probable cause. Defendant's acts were willful, knowing, deliberate, and malicious, as explained above.

165.    Defendant United States, through its investigative and law enforcement officers, initiated criminal proceedings against Plaintiffs when it caused Officer Sutton to be indicted for murder, in violation of D.C. Code § 22-2103, and caused Officer Sutton and Lieutenant Zabavsky

to be indicted for obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(2), and conspiracy to commit obstruction of justice, in violation of 18 U.S.C. § 371.

166.    Plaintiffs' prosecution was unsupported by probable cause. "Recklessness" is an element of second-degree murder in the District of Columbia. Courts, however, have repeatedly rejected that a police chase becomes legally "reckless" if it violates an internal police rule and have made clear that even 80 mph police pursuits do not constitute "reckless" conduct. And Officer Sutton clearly had a law-enforcement justification defense to any charge arising from his attempts to stop and detain Hylton-Brown, including by low-speed pursuit.

167.    Moreover, the obstruction statute under which Plaintiffs were charged makes it a crime to "prevent the communication to a [federal] law enforcement officer … information relating to the commission or possible commission of a Federal offense," 18 U.S.C. § 1512(b)(3). There was never any basis, however, for Defendant or its agents to believe that any federal offense was possibly committed here, especially when Supreme Court precedent foreclosed the possibility of a civil rights violation where, as here, a police chase ends in an accident between a fleeing suspect and a third-party vehicle without contact between law enforcement and the suspect. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

168.    Any reasonably well-trained officer or person of ordinary prudence would have recognized that Plaintiffs' pursuit of Hylton-Brown did not amount to murder, obstruction of justice, or conspiracy, and thus that there would not be probable cause for their prosecution. Nor was there probable cause to investigate Plaintiffs for civil rights violations as there was *no* evidence of race playing a role in the pursuit of Hylton-Brown.

169.    The prosecution and proceedings against Plaintiffs were terminated in their favor when the U.S. Attorney's Office moved to vacate their convictions and dismissed the charges

50

following President Trump's issuance of full and unconditional pardons to Sutton and Zabavsky. The U.S. Attorney statements following the pardons—namely, that Sutton and Zabavsky were "both wrongfully convicted of a bogus charge"—further supports the lack of probable cause.

170.    At all relevant times, Defendant United States, through its investigative and law enforcement officers, acted with malice, which can be inferred from the obvious lack of probable cause justifying Plaintiffs' prosecution, prosecutorial misconduct, the withholding an spoliation of exculpatory material, misrepresentations at trial, the need for a scapegoat during ongoing civil unrest related to the Defund the Police movement that was at its height at the time of the accident, the charges coinciding with an incoming administration that publicly prioritized prosecutions of police officers, and the other facts alleged in this Complaint.

171.    As a direct and proximate result of, and but for Defendant United States's malicious prosecution and unreasonable seizure pursuant to legal process, Plaintiffs have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their careers and employment prospects, among other damages.

172.    Accordingly, Defendant United States is liable to Plaintiffs for damages pursuant to 28 U.S.C. § 2674.

**COUNT II**
**28 U.S.C. § 2674 – Abuse of Process in Violation of the Federal Tort Claims Act**

173.    Plaintiffs reallege and incorporate by reference the above paragraphs as if fully alleged herein.

174.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

175.    The agents and agencies named herein, for whom Defendant United States is responsible, abused their official positions and authority to bring process against Officer Sutton and Lieutenant Zabavsky for an improper motive, which can be inferred from the obvious lack of probable cause justifying Plaintiffs' prosecution, prosecutorial misconduct, the withholding and spoliation of exculpatory material, misrepresentations at trial, the need for a scapegoat during ongoing civil unrest related to the Defund the Police movement that was at its height at the time of the accident, the charges coinciding with an incoming administration that publicly prioritized prosecutions of police officers, and the other facts alleged in this Complaint..

176.    As a direct and proximate result of, and but for the United States's malicious prosecution and abuse of process, Plaintiffs have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their careers and employment prospects, among other damages.

177.    Accordingly, Defendant United States is liable to Plaintiffs for damages pursuant to 28 U.S.C. § 2674.

## COUNT III
### 28 U.S.C. § 2674 – False Arrest in Violation of the Federal Tort Claims Act

178.    Plaintiffs reallege and incorporate by reference the above paragraphs as if fully alleged herein.

179.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

180.    Defendant United States, through its through its investigative and law enforcement officers, arrested Plaintiffs and transported them to the US Marshalls' cell block.

52

181. Defendant's agents lacked legal authority to arrest Plaintiffs because they lacked probable cause. "Recklessness" is an element of second-degree murder in the District of Columbia that Officer Sutton was charged with. Courts have repeatedly rejected that a police chase becomes legally "reckless" if it violates an internal police rule and have made clear that even 80 mph police pursuits do not constitute "reckless" conduct. And Officer Sutton clearly had a law-enforcement justification defense to any charge arising from his pursuit of Hylton-Brown.

182. Moreover, the obstruction statute that Plaintiffs were charged makes it a crime to "prevent the communication to a [federal] law enforcement officer … information relating to the commission or possible commission of a Federal offense," 18 U.S.C. § 1512(b)(3). There was never any basis, however, for an officer to believe there any federal offense, especially when Supreme Court precedent foreclosed the possibility of a civil rights violation where, as here, a police chase ends in an accident between a fleeing suspect and a third-party vehicle. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998).

183. Any reasonably well-trained officer or person of ordinary prudence would have recognized that Plaintiffs' pursuit of Hylton-Brown did not amount to murder, obstruction of justice, or conspiracy, and thus that there would not be probable cause for their arrest. Nor was there probable cause to investigative Plaintiffs for civil rights violations as there was *no* evidence of race playing a role in the pursuit of Hylton-Brown.

184. As a direct and proximate result of, and but for Defendant United States's false arrest and false imprisonment, Plaintiffs have suffered and continue to suffer severe physical, mental, and emotional distress, reputational harm, and harm to their careers and employment prospects, among other damages.

185. Accordingly, Defendant United States are liable to Plaintiffs for damages pursuant

53

to 28 U.S.C. § 2674.

## COUNT IV
## 28 U.S.C. § 2674 – False Imprisonment in Violation of the Federal Tort Claims Act

186.    Plaintiffs reallege and incorporate by reference the above paragraphs as if fully alleged herein.

187.    The Federal Tort Claims Act provides "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674.

188.    In the District of Columbia, the torts of false arrest and false imprisonment are indistinguishable. *See Harris v. United States Dep't of Veterans Affairs*, 776 F.3d 907, 912 n.2 (D.C. Cir. 2015).

189.    Accordingly, Defendant United States is liable to Plaintiffs for damages pursuant to 28 U.S.C. § 2674.

## Prayer for Relief

190.    Accordingly, Plaintiffs respectfully request the Court grant the following relief:

A.    Declaration that Defendant United States maliciously prosecuted, falsely arrested, and falsely imprisoned Plaintiffs;

B.    Compensatory damages in an amount to be determined at trial but expected to exceed $15,000,000.00, pursuant to Plaintiffs' claims against Defendant;

C.    Attorneys' fees as permitted by law;

D.    Pre-judgment and post-judgment interest to the extent permitted by law; and

E.    Such additional relief as this Court deems just, necessary, and appropriate.

Dated: June 8, 2026

Respectfully submitted,

*/s/ Jonathan Fahey*
Jonathan Fahey (D.C. Bar No. 90013952)
Kellen S. Dwyer* (D.C. Bar No. 1008151)
Andreas N. Episkopos* (D.C. Bar No. 90033371)
HOLTZMAN VOGEL BARAN TORCHINSKY &
JOSEFIAK, PLLC
2300 N Street NW, Suite 643
Washington, D.C. 20037
Phone: (202) 737-8808
jfahey@holtzmanvogel.com
kdwyer@holtzmanvogel.com
aepiskopos@holtzmanvogel.com

Christopher Zampogna (D.C. Bar No. 449851)
ZAMPOGNA PC
1775 Eye Street NW, Suite 1150
Washington, D.C. 20006
Phone: (202) 223-6635
caz@zampognalaw.com

Carmen D. Hernandez (MD Bar No. 03366)
Law Office of Carmen Hernandez
7166 Mink Hollow Rd
Highland, MD 20777
Phone: (240) 472-3391

*Counsel for Plaintiffs*

*\*Application for Admission Pending*

55